<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

<table>
<tr><td>

G.L. and C.L., individually and as
guardians *ad litem* of W.L.,

               Plaintiffs,

           v.

VERONA BORO BOARD OF
EDUCATION,

               Defendant.

</td>
<td>

Case No. 2:23-cv-00938 (BRM) (AME)

**OPINION**

</td></tr>
</table>

**MARTINOTTI, DISTRICT JUDGE**

      Before the Court are two Cross-Motions for Summary Judgment. The first is Defendant Verona Boro Board of Education's (the "BOE") Motion for Summary Judgment. (ECF No. 17.) The second is Plaintiffs G.L. and C.L.'s ("Plaintiffs") Motion for Summary Judgment. (ECF No. 18.) The BOE opposed Plaintiffs' Motion (ECF. No. 25), and Plaintiffs opposed the BOE's Motion (ECF No. 26). The parties filed their respective replies. (ECF Nos. 27, 28.) Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, the BOE's Motion for Summary Judgment (ECF No. 17) is **DENIED**, Plaintiffs' Motion for Summary Judgment (ECF No. 18) is **DENIED**, and the matter is **REMANDED** to the Honorable Julio C. Morejon, Administrative Law Judge for further proceedings consistent with this Opinion.

I. **BACKGROUND**

A. **Statutory Background: Individuals with Disabilities Education Act**

This matter arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* as an appeal from the Final Decision of the Honorable Julio C. Morejon, Administrative Law Judge, issued on November 17, 2022 (the "November 17, 2022 Final Decision").

The IDEA provides federal funding to assist state and local agencies in educating disabled children. The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d). Under the IDEA, public educational institutions must "identify and effectively educate" disabled students by providing free appropriate public education ("FAPE"), "or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). A FAPE must consist of "educational instruction specifically designed to meet the unique needs of the [disabled] child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268–69 (3d Cir. 2012) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89 (1982)).

A FAPE is provided through an individualized education program ("IEP"). *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004) (citing 20 U.S.C. § 1414(d)); *Y.B. v. Howell Twp. Bd. of Educ.*, 4 F.4th 196, 198 (3d Cir. 2021) (explaining an IEP is "[t]he 'primary vehicle,' for providing each eligible student with an IDEA-mandated FAPE."

(citations omitted)). Generally, an IEP is a written statement, "developed, reviewed, and revised by the IEP Team—a group of school officials and the parents of the student—that spells out how a school will meet an individual disabled student's educational needs." *Id.* (quotation marks omitted) (quoting 20 U.S.C. § 1414(d)(1)(A), (B)). "[A]n IEP describes a child's 'present levels of academic achievement,' offers 'measurable annual goals' to 'enable the child to . . . make progress in the general educational curriculum,' and describes 'supplementary aids and services . . . provided to the child' to meet those goals." *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I), (II)(aa), (IV)). The educational benefit conferred to the student through the IEP must be "meaningful," *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180 (3d Cir. 1988), meaning "more than a trivial educational benefit" in light of the student's "individual abilities," *Ridley*, 680 F.3d at 269. Once the IEP is put in place, the school district must implement the IEP in the least restrictive environment ("LRE"). *See* 20 U.S.C. § 1412(a)(5) ("To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.").

If a parent believes the IEP failed to provide their child with a FAPE in the LRE, they may partake in an administrative "impartial due process hearing," *see* 20 U.S.C. § 1415; *Shore Reg'l*, 381 F.3d at 198 (citing 20 U.S.C. § 1415(e)), on the "identification, evaluation, and educational placement of the child, or the provision of a [FAPE] to such child," 20 U.S.C. § 1415(b)(6)(A). Any party who is dissatisfied with the outcome of the administrative proceeding may file an appeal in a district court of the United States. 20 U.S.C. § 1415(i)(2)(A).

Where a school district has failed to offer a child a FAPE, "[p]arents may unilaterally place

their child at a different school" and seek reimbursement from the school district. *J.F. v. Byram Twp. Bd. of Educ.*, 812 F. App'x 79, 81 (3d Cir. 2020) (citing *Shore Reg'l*, 381 F.3d at 198); N.J. Admin. Code § 6A:14–2.10(d). The cost of reimbursement, however, may be reduced or denied by an administrative law judge ("ALJ") if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> (bb) 10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency . . . .

20 U.S.C. § 1412(a)(10)(C).[1]

The IDEA requires two factual findings before reimbursing costs for unilateral placement. The first inquiry is whether the school district offered FAPE in the LRE. *See Shore Reg'l*, 381 F.3d at 198–99. The burden is on the school to show "it complied with the procedures set out in the IDEA and that the IEP was 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential.'" *Id.* at 199; *see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. Re-1*, 580 U.S. 386, 399 (2017) ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."). No reimbursement is required if the school district demonstrates that it offered the student FAPE. *Shore Reg'l*, 381 F.3d at 199. However, if the school district failed to provide FAPE, the second inquiry is whether the

---

[1] This section has been codified by the New Jersey Department of Education as N.J.A.C. 6A:14-2.10. *See Shore Reg'l*, 381 F.3d at 198 (explaining that as long as a state satisfies the requirements of the IDEA, it may fashion its own procedures).

student's parents acted appropriately in removing the child from the school district. *Id.*; *see also*
*School Comm'n of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985). Even
where both steps of the inquiry are met, "courts retain discretion to reduce the amount of a
reimbursement award if the equities so warrant." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59,
71 (3d Cir. 2010) (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009)).

### B.    Factual Background[2]

W.L. is currently a nine-year-old student diagnosed with autism spectrum disorder,
childhood apraxia of speech, mixed receptive/expressive language disorder, specific
developmental disorder, and motor dysfunction. (ECF No. 17-1 ¶¶ 1–2; ECF No. 18-2 ¶ 1; ECF
No. 25-1 ¶ 1.)[3] In March 2019, W.L. moved to the Township of Verona from the Borough of Glen

---

[2] The factual allegations cited herein are drawn from the parties' Statements of Undisputed
Material Facts. (ECF Nos. 17-1; ECF No. 18-2.) Although an administrative appeal under the
IDEA differs from a typical summary judgment motion, it would be remiss of the Court not to
mention Plaintiffs' procedural missteps. For instance, Plaintiff provided a statement of material
facts with multiple paragraphs which do not cite to record evidence and other documents submitted
in support of Plaintiff's Motion. (*See* ECF No. 18-2.) The Court finds that Plaintiff's factual
statements which merely cite to paragraphs of the complaint are not properly supported. *See* Fed.
R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support
the assertion by: (A) citing to particular parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or declarations, stipulations (including
those made for purposes of the motion only), admissions, interrogatory answers, or other materials
. . . ."); *Kim v. Marina Dist. Dev. Co. LLC*, Civ. A. No. 09-1553, 2010 WL 1169286, at *1 (D.N.J.
May 21, 2010) ("A party cannot rely upon his [or her] pleading's allegations in a motion for
summary judgment, however." (citations omitted)); *Shah v. Bank of Am.*, 346 F. App'x 831, 833
(3d Cir. 2009) ("To survive a motion for summary judgment, the plaintiff cannot rely on
unsupported allegations in the complaint, and must present more than the 'mere existence of a
scintilla of evidence' in his favor.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252
(1986)). Regardless, facts are also drawn from Judge Morejon's Final Decision dated November
17, 2022. (ECF No. 19-25.) *See Shore Reg'l*, 381 F.3d at 199 ("[F]actual findings from the
administrative proceedings are to be considered prima facie correct, and if a reviewing court fails
to adhere to them, it is obliged to explain why." (citations and quotation marks omitted)).

[3] Plaintiffs did not submit a responsive statement of material facts as required by Local Civil Rule
56.1(a); therefore, the BOE's statement of material facts (ECF No. 17-1) may be deemed
undisputed pursuant to local civil rules. *See* L. Civ. R. 56.1(a) ("The opponent of summary

Ridge. (ECF No. 17-1 ¶ 1; ECF No. 18-2 ¶ 7; ECF No. 25-1 ¶ 7.) W.L.'s last IEP in the Glen Ridge School District was dated October 17, 2018, and prescribed a split-day program that included a split between a self-contained class with Applied Behavior Analysis ("ABA") and a class in an inclusive setting. (ECF No. 17-1 ¶ 3; ECF No. 18-2 ¶ 5; ECF No. 25-1 ¶ 5.)

Because W.L. was five years old when he entered the Verona School District (the "District"), W.L. required a series of evaluations before moving on to kindergarten. (ECF No. 17-1 ¶ 5; ECF No. 19-25 at 5.) Pending the outcome of the evaluations, W.L. was placed in a preschool disabilities class in the District's Learning, Sensory, and Social ("LSS") program at the Laning Elementary School, with physical, occupational, and speech-language therapy, a personal aide, and behavioral intervention consultation. (ECF No. 17-1 ¶¶ 8–10; ECF No. 18-2 ¶ 8; ECF No. 25-1 ¶ 8.) There were four students in W.L.'s class, including two rising first grade students the District thought would be a good example for W.L. (ECF No. 18-2 ¶ 8; ECF No. 25-1 ¶ 8; ECF No. 19-25 at 5.) The LSS program was based on the principles of ABA and used an evidence-based program

---

judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."); *see also Callahan v. U.S. Postal Serv.*, Civ. A. No. 13–3147, 2014 WL 2999066, at *2 (D.N.J. June 25, 2014) ("Plaintiff did not submit, with his opposition papers, a responsive statement of material facts. Thus, Plaintiff did not dispute any of the material facts asserted by Defendant, and Defendant's L. Civ. R. 56.1 Statement is deemed undisputed for purposes of the summary judgment motion."); *Schneider v. Shah*, Civ. A. No. 11–2266, 2012 WL 1161584, at *3 (D.N.J. Apr. 9, 2012), *aff'd*, 507 F. App'x 132 (3d Cir. 2012). However, "the purpose of certain district court local rules pertaining to motions is the '[f]acilitation of the court's disposition of motions, not punishment.'" *Boswell v. Eoon*, 452 F. App'x 107, 111–12 (3d Cir. 2011) (alteration in original) (citing *Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993)). Therefore, the Court analyzed Plaintiffs' briefing and the evidentiary record to determine whether there were any disputes as to the BOE's statement of material facts. *See Boswell*, 452 F. App'x at 112 ("Permitting the non-movant to rely on its briefing and evidentiary submissions to dispute the movant's 56.1 statement is consistent with the requirement at summary judgment that federal courts 'view the facts in the light most favorable to the non-moving party.'") (citing *Jakimas v. Hoffmann–La Roche. Inc.*, 485 F.3d 770, 777 (3d Cir. 2007)).

called "ReThinkEd" that assists in scaffolding instruction. (ECF No. 17-1 ¶ 10; ECF No. 19-25 at 11.) One of the professionals assigned to W.L.'s class was Brooke Raskin, M.Ed. ("Raskin"), the District's Board-Certified Behavior Analyst ("BCBA"), who had previously worked with W.L. as his at-home BCBA and had played in a role in Plaintiffs' decision to move to the District. (ECF No. 18-2 ¶ 7; ECF No. 25-1 ¶ 7.)

After the evaluations were completed, the Plaintiffs met with representatives of the District on June 4, 2019, and developed an IEP for the 2019–2020 school year (the "2019–2020 IEP") that provided for W.L.'s advancement to kindergarten in the LSS program, an increase of time in W.L.'s placement in the LSS classroom, and a continuation of substantially similar therapies and supports. (ECF No. 17-1 ¶ 11; ECF No. 18-2 ¶ 12; ECF No. 25-1 ¶ 12.) The 2019–2020 IEP also provided for extended school year ("ESY") programming for the 2019 summer. (ECF No. 17-1 ¶ 18; ECF No. 18-2 ¶ 9; ECF No. 19-25 at 6.) But Plaintiffs declined the ESY programming and instead arranged for private services by an agency, Hand Over Hand, which provided Plaintiffs with an at-home BCBA, Stacy O'Keefe ("O'Keefe"), who worked with W.L. throughout the 2019–2020 school year. (*Id.*)

During the fall of 2019, Plaintiffs raised concerns about aspects of the LSS program including: W.L.'s unsupervised stimming behavior in the morning before classes began; W.L.'s use of an iPad which Plaintiffs believed had no educational value and resulted in W.L. developing a dependency; W.L.'s exhibition of school aversion behaviors; the lack of W.L.'s interaction with neurotypical peers. (ECF No. 17-1 ¶ 20; ECF No. 19-25 at 6.) At an IEP meeting in October 2019 Plaintiffs reiterated their concerns, and the District thereafter developed a reverse inclusion program whereby general education students would come into the LSS classroom to interact with W.L. and his classmates. (ECF No. 17-1 ¶ 21; ECF No. 18-2 ¶ 21; ECF No. 19-25 at 7.)

7

Following the October 2019 IEP meeting, the District believed Plaintiffs' concerns were addressed and resolved amicably with the assistance of Plaintiffs' non-attorney advocate, Susan Verrico. (ECF No 17-1 ¶ 20; ECF No. 19-25 at 7.) However, this was not the case, as Plaintiffs decided to retain their own independent professionals—Carly Fog ("Fog"), M.S., CCC-SLP, a Speech-Language Pathologist, and Dr. Carol Fiorile, P.h.D. ("Dr. Fiorile"), a Board-Certified Behavior Analyst—to evaluate W.L. and conduct observations. (ECF No. 17-1 ¶ 23; ECF No. 18-2 ¶ 26; ECF No. 25-1 ¶ 26.) On December 13, 2019, Dr. Fiorile conducted a two-hour observation of W.L. in the LSS program. (ECF No. 17-1 ¶ 24; ECF No. 18-2 ¶ 27; ECF No. 25-1 ¶ 27; ECF No. 19-25 at 7.) Dr. Fiorile also reviewed records and spoke with the District's relevant staff members. (*Id.*) Fog conducted her observation of W.L. on December 19, 2019. (ECF No. 17-1 ¶ 24; ECF No. 19-25 at 7.)

On December 23, 2019, Plaintiffs' attorney sent a letter to the District's counsel stating that Dr. Fiorile and Fog had advised Plaintiffs that W.L. required an out-of-district placement with more intensive ABA because W.L.'s LSS program was inappropriate and not meeting his needs. (ECF No. 17-1 ¶ 27; ECF No. 18-2 ¶ 31; ECF No. 25-1 ¶ 31.) Plaintiffs requested that the District send W.L.'s records to potential placements. (ECF No. 19-25 at 8.) On January 2, 2020, the District responded to Plaintiffs' letter whereby the District stated that the District's data displayed that W.L. was progressing and offered to meet with Plaintiffs. (ECF No. 17-1 ¶ 28; ECF No. 18-2 ¶ 32; ECF No. 25-1 ¶ 32.) At the subsequent meeting on January 10, 2020, the parties did not agree to change W.L.'s placement, but Plaintiffs decided to continue with the District's LSS program. (ECF No. 19-25 at 8; *see also* ECF No. 18-2 ¶ 33.) Further, the District indicated its willingness to expose W.L. to non-disabled peers, and provided Plaintiffs with a copy of W.L.'s program book. (ECF No. 17-1 ¶¶ 29–30; ECF No. 19-25 at 8.)

Following the outbreak of the COVID-19 Pandemic, the District implemented a program of remote instruction; packets of instructional material were sent to all of the students' homes, but there was a delay in W.L. receiving his packets because Plaintiffs relocated to their shore home without notifying the District. (ECF No. 17-1 ¶¶ 36–37; ECF No. 18-2 ¶ 34; ECF No. 19-25 at 9.) Although the District was prepared to offer remote speech therapy at an earlier point in time, Plaintiffs informed the District they were not ready to resume speech therapy until late April 2020. (ECF No. 17-1 ¶ 39; ECF No. 19-25 at 9.) Plaintiffs lived separately during the spring of 2020 to avoid the spread of pathogens because G.L. is a surgeon and physician. (ECF No. 17-1 ¶ 38; ECF No. 19-25 at 9.)

W.L. struggled with the remote academic programs provided by the District. (ECF No. 19-25 at 9.) For example, W.L. would refuse to participate in remote lessons. (*Id.*) At the recommendation of O'Keefe, Plaintiffs notified the District in late May 2020 that they were ending W.L.'s remote instruction with the District. (*Id.*; ECF No. 17-1 ¶ 40; ECF No. 18-2 ¶ 34.) W.L.'s case manager, Catherine Rhodes, emailed C.L. on June 1, 2020 requesting a letter from O'Keefe "outlining her concerns" about W.L. and his remote instruction so that the District could address any issues. (ECF No. 17-1 ¶ 99; ECF No. 19-25 at 9.) The District did not receive a letter back from O'Keefe until late July 2020. (ECF No. 17-1 ¶ 100; ECF No. 19-25 at 9.)

During the 2019–2020 school year, W.L.'s education faced several hurdles including: W.L. was absent from his schooling on sixteen days and tardy on an additional five days; W.L. missed fourteen speech therapy sessions prior to the COVID-19 Pandemic shutdown; W.L.'s at-home ABA services with O'Keefe were suspended for a few months due to a lapse in insurance coverage; the departure of a longstanding nanny disrupted W.L.'s daily routine. (ECF No. 17-1 ¶ 35; ECF No. 19-25 at 8–9.) In the face of these difficulties, W.L. made "steady" to "satisfactory" progress

towards achieving the goals and objectives in the 2019–2020 IEP, but W.L. only fully achieved one out of thirty-eight of the 2019–2020 IEP's goals. (ECF No. 17-1 ¶ 31; ECF No. 18-2 ¶ 37; ECF No. 25-1 ¶ 37; ECF No. 19-25 at 8.)

On June 18, 2020, Plaintiffs met with representatives of the District for what was purported to be an IEP meeting to discuss W.L.'s IEP for the 2020–2021 school year (the "2020–2021 IEP"). (ECF No. 17-1 at 42; ECF No. 18-2 ¶ 36; ECF No. 25-1 ¶ 36.) On this date, Plaintiffs' counsel provided the District with copies of Dr. Fiorile's report dated April 12, 2020, and Fog's undated report. (ECF No. 17-1 ¶ 43; ECF No. 18-2 ¶ 35; ECF No. 25-1 ¶ 35.) Plaintiffs also notified the District of their intentions to place W.L. at the DATA Group, a behavioral service provider approved by the New Jersey Department of Education, and seek retroactive reimbursement. (ECF No. 17-1 ¶ 43; ECF No. 19-25 at 10.) At this meeting, the District declined to place W.L. at the DATA Group and recommended that W.L. proceed to first grade in the LSS program. (ECF No. 17-1 ¶ 46; ECF No. 19-25 at 10.) Subsequently, the parties engaged in additional discussions, and the District proposed a modified IEP on July 7, 2020 that incorporated many of the recommendations from Dr. Fiorile and Fog. (ECF No. 17-1 ¶¶ 48–50, 53–64; ECF No. 19-25 at 10.) Thereafter, upon proper and timely notice, Plaintiffs unilaterally placed W.L. at the Data Group. (ECF No. 18-2 ¶ 38; ECF No. 25-1 ¶ 38.)

On August 28, 2020, Plaintiffs filed a Petition for Due Process with the Office of Special Education, alleging the BOE failed to provide W.L. with a FAPE. (ECF No. 18-2 ¶ 39; ECF No. 25-1 ¶ 39; ECF No. 19-25 at 2.) Plaintiffs sought reimbursement for the cost of W.L.'s placement at the DATA Group. (*Id.*) Thereafter, the matter was transferred to the Office of Administrative Law on September 30, 2020. (*Id.*) After settlement efforts were unsuccessful, the matter was assigned to Judge Morejon on November 10, 2020. (ECF No. 19-25 at 2.)

### C.    Judge Morejon's August 18, 2021 Decision Barring Audio Recordings

On March 23, 2021, over four months after the Petition for Due Process was assigned to Judge Morejon, Plaintiffs notified the BOE that they had placed a recording device on W.L.'s belongings prior to multiple school days during the 2019–2020 school year thereby recording statements made by the District's staff. (ECF No. 17-1 ¶ 26; ECF No. 19-17 at 2.) On June 9, 2021, the BOE filed a motion to bar the introduction of audio recordings made by Plaintiffs while W.L. was on Laning Elementary School property. (ECF No. 19-25 at 2.) On June 21, 2021, Plaintiffs filed an opposition to the BOE's motion. (*Id.*) On August 18, 2021, Judge Morejon issued an Order which granted BOE's motion to bar the audio recordings. (ECF No. 19-17; ECF No. 18-2 ¶ 40; ECF No. 25-1 ¶ 40.) Judge Morejon held that the creation of the audio recordings violated the New Jersey Wiretapping and Electronic Surveillance Act, N.J.S.A. § 2A:156A-1, *et seq.* (the "Wiretap Act") because vicarious consent was not applicable. (ECF No. 19-17 at 6–8.) Additionally, Judge Morejon found Plaintiffs violated the BOE's District Policy 5516 by attaching a recording device to W.L. while he was on school grounds without the consent of the individuals being recorded. (*Id.* at 8–10.)

### D.    Judge Morejon's Findings in the November 17, 2022 Final Decision

Judge Morejon conducted hearings on June 23, June 29, June 30, July 21, August 18, September 22, and September 23, 2021. (ECF No. 19-25 at 2.) Briefs were filed on July 11, 2022. (*Id.*) On November 17, 2022, Judge Morejon issued a thirty-nine-page Final Decision with a four-page appendix. (ECF No. 19-25; ECF No. 18-2 ¶ 41; ECF No. 25-1 ¶ 41.) Judge Morejon provided voluminous summaries of the testimony and insightful credibility determinations. (ECF No. 19-25 at 10–33.)

During the administrative proceedings, Judge Morejon heard the testimony of Plaintiffs,

11

four witnesses presented by Plaintiffs, and three witnesses presented by the BOE. (ECF No. 19-25 at 10.) The BOE presented Dr. Frank Mauriello ("Dr. Mauriello"), the District's Director of Special Services; Ilissa Abovitz ("Abovitz"), the District's Speech-Language Pathologist; and Raskin. (*Id.*) Plaintiffs presented Fog, Dr. Fiorile, O'Keefe, and Tara Sheerin, the Executive Director of the DATA Group ("Sheerin"). (*Id.*)

Dr. Mauriello testified that the 2019–2020 IEP contained a full range of services to address W.L.'s unique needs, and was based on evaluations conducted by the District's child study team ("CST") in May 2019 as W.L. was aging out of the preschool program. (*Id.* at 11.) Dr. Mauriello recalled that Plaintiffs voiced their preference for W.L. to remain in another year of preschool, but otherwise he did not recall Plaintiffs raising any other concerns when the 2019–2020 IEP was created. (*Id.*) Dr. Mauriello stated the CST determined that the LSS Program would be appropriate for W.L.'s kindergarten year because it was designed to support children who needed behavior modalities to access the curriculum. (*Id.*) Dr. Mauriello noted that the LSS Program: integrated services such as speech and language therapy into the program; was overseen by himself and Raskin; provided "push-in" and "pull-out" services and opportunities to interact with general education peers through music, art, and physical education instruction; introduced a reverse inclusion model wherein the general education students would participate with the LSS Program between ten and twenty minutes a day. (*Id.* at 11–12.) Dr. Mauriello further noted that an assistive technology evaluation would have allowed the District to explore devices that could help W.L.'s communication so he could better access his peers and education, but this evaluation was not proposed by the District until February 2020. (*Id.* at 12.)

On cross-examination, Dr. Mauriello acknowledged that W.L. achieved one out of thirty-eight goals from the 2019–2020 IEP. (*Id.* at 12–13.) During his rebuttal testimony, Dr. Mauriello

testified W.L. did not exhibit spikes in poor behavior prior to the commencement of home instruction in April 2020, and that the BOE did not reach out to Plaintiffs' BCBA, O'Keefe, during this time. (*Id.* at 13.) Further, he stated that the District was unable to gauge whether W.L. could be infused in non-disabled classroom settings because W.L. did not participate in the ESY program. (*Id.*)

The BOE also presented the testimony of Abovitz. She works with students at the Laning Elementary School. (*Id.* at 13.) Abovitz testified she began to work with W.L. in September 2019. (*Id.*) She noted that she is not involved in the development of her students' IEPs, and that she was not involved in the development of the 2019–2020 IEP. (*Id.*) Abovitz testified W.L. missed fourteen speech sessions due to absences and tardiness from September 2019 to March 2020. (*Id.*) Abovitz acknowledged that Plaintiffs requested W.L. be provided with an augmentative and alternative communication ("AAC") system. (*Id.* at 14.) However, she also stated she did not believe W.L. needed an AAC system because he is a verbal communicator and a strong imitator. (*Id.*) Abovitz testified that C.L. authorized an AAC evaluation plan for W.L. in December 2019, and the evaluation took place on February 27, 2020, resulting in a completed report dated March 26, 2020. (*Id.*) Further, Abovitz acknowledged she was present for Fog's in-person evaluation of W.L. in a group setting and in an English and Language Arts activity. (*Id.*) Abovitz testified that she agreed and disagreed with some of the findings and recommendations in Fog's written evaluation. (*Id.*)

After waiting weeks for the State of New Jersey's authorization to conduct remote tele-therapy following the District's closure from the COVID-19 Pandemic, Abovitz stated: she resumed language tele-therapy sessions on April 22, 2020; tele-therapy sessions were scheduled three times a week for thirty-minute sessions; there were some difficult sessions due to W.L.'s elopement from the computer which she described as W.L. running away from the computer

screen. (*Id.* at 15.) Notwithstanding, Abovitz testified that W.L. made progress during the 2019–2020 school year despite his attendance record pre-COVID and the interruptions in sessions once COVID commenced. (*Id.*)

On cross-examination, Abovitz testified that many of W.L.'s IEP goals for speech and language were not attained in the 2019–2020 school year. (*Id.*) She noted the District re-wrote the missed goals in the 2020–2021 IEP. (*Id.*) Abovitz further testified that she provided W.L. with visual, verbal, and tactile support because he required a different level of support than what his IEP goals indicated. (*Id.*)

Finally, the BOE presented the testimony of Raskin. Raskin was qualified as an expert in ABA. (*Id.*) Raskin testified she worked with W.L. and Plaintiffs as a behavior analyst in a supervisory role prior to Plaintiffs moved to the District. (*Id.*) She noted that she was in constant contact with the LSS Program's teachers, and that she personally instructed W.L. five times a week. (*Id.*)

Raskin testified that she first became aware of C.L.'s concerns of W.L. exhibiting school aversion issues in October 2019. (*Id.*) Raskin witnessed W.L. having "tantrums" during this time. (*Id.*) Raskin testified that C.L. sent an email to staff in January 2020 regarding renewed concerns about W.L. having school aversion. (*Id.*) Raskin stated she spoke with O'Keefe who explained various changes were going on at home for W.L., which might be the reason for his behavior. (*Id.*) Raskin noted she and O'Keefe collaborated to create a morning schedule for W.L. that appeared to work because W.L. was in attendance most days between mid-January 2020 and the mandated COVID closure on March 16, 2020. (*Id.*) Regarding Dr. Fiorile's April 2020 evaluation of W.L. and the June 2020 written report, Raskin testified the following: Dr. Fiorile's recommendations were being addressed in the District's proposed 2020–2021 IEP because the District was

attempting to collaborate with Plaintiffs; and the collection of data can be completed daily when it pertains to the student's behavior, or periodically when it involves task and goal achievements. (*Id.* at 16–17.) Raskin conceded that data concerning W.L.'s performance in achieving the IEP's goals and objective should be collected daily. (*Id.* at 17.) However, Raskin also clarified that, while the data may not have been collected on the date it occurred, teachers inputted data weekly. (*Id.*) Raskin further testified a substitute teacher should not have used the credentials of a regular teacher to input data. (*Id.*)

On cross-examination, Raskin agreed that accurate data is critical for an ABA program to function properly. (*Id.*) Raskin further agreed with Dr. Fiorile's finding that data was not recorded during W.L.'s observation. (*Id.*) Additionally, Raskin conceded that there was more than a week between each data point on the District's graphs. (*Id.*) Raskin noted how W.L.'s behavior in dropping to the floor and requiring an hour of redirection could interfere with his learning. (*Id.*) Raskin conceded she did not implement a behavior intervention plan. (*Id.*)

Judge Morejon found Dr. Mauriello, Abovitz, and Raskin's testimony "to be credible and reliable inasmuch as their testimony reveals that they do not want to deprive [W.L.] of any program[m]ing to augment his educational opportunities but they must also work within the parameters of the law, regulations and facts as presented." (*Id.* at 31.) Additionally, Judge Morejon found the BOE's "witnesses' testimony also credible [in] that they collaborated with [Plaintiffs] in implementing an appropriate program for [W.L.] and even sought to include in the 2020 IEP many of the recommendations put forth by [Plaintiffs'] two experts and that they already included many of the expert's recommendations therein." (*Id.* at 31–32.)

First, Plaintiffs presented Fog as a witness. (*Id.* at 17.) Fog qualified as an expert in speech pathology. (*Id.* at 18.) Fog testified that part of her current practice includes consulting with school

districts in New Jersey seeking to create appropriate IEPs for their students. (*Id.*) Fog notably testified regarding the evaluations that she conducted of W.L. at the Laning Elementary School and at the Princeton Learning Center. (*Id.*) Fog noted that she found: W.L.'s language will affect him in all settings; W.L. will struggle to understand communication and language; W.L. will struggle to express himself and use language. (*Id.*) Concerning her observation of W.L. at the Laning Elementary School, Fog testified she: observed W.L. in a classroom setting because the District indicated that his classroom was a language-rich program; and found the District's program to be inappropriate because visual strategies and language were used ineffectively and supports and scaffolding were not evident. (*Id.*) Fog noted that she recommended W.L. be placed out of district at a service provider staffed with professionals who have specific training with both autism spectrum and language disorder. (*Id.*)

On cross-examination, Fog testified she relied upon the 2019–2020 IEP when she conducted her evaluations. (*Id.* at 18–19.) Additionally, Fog acknowledged she was aware Plaintiffs had expressed their desire for W.L. to be placed out-of-district. (*Id.* at 19.) Fog also stated that she sent Plaintiffs a copy of her report for them to "fact check," and that she met with Plaintiffs before submitting her report to the District. (*Id.*) In response to questioning from Judge Morejon, Fog stated she did not ask questions of the District's staff after she evaluated W.L. at the Laning Elementary School. (*Id.*)

Judge Morejon found Fog's testimony to be unreliable and not credible because she did not review documents which included data on W.L.'s progress during the 2019–2020 school year, and did not receive any input from the District's staff on how they were approaching specific issues of concern. (*Id.* at 32.) Further, Judge Morejon found "Fog's testimony concerning her December observation to have little w[e]ight inasmuch as she is a speech-language expert but never requested

to observe any speech therapy sessions, only [W.L.]'s LSS classroom." (*Id.*) Judge Morejon also noted Fog did not offer an expert opinion about the adequacy of the 2020–20201 IEP, "or why the [D]istrict's incorporation of some of her recommendations would not have been sufficient." (*Id.* at 32.)

Next, Plaintiffs presented Sheerin as a witness, who was qualified as an expert in the areas of ABA, special education, and designing programs for students with autism. (*Id.*) Sheerin stated the DATA Group works with both parents and school districts. (*Id.* at 20.) She stated she became familiar with W.L. in June 2020 when he became a student at the DATA Group. (*Id.*) Sheerin noted she sees W.L. on a daily basis. (*Id.*) Sheerin testified that when W.L. entered the program at the DATA Group, he was a child in "crisis" who was very disconnected, unable to manage his frustration, and non-responsive. (*Id.*) Sheerin testified that, in constructing a program for W.L., the DATA Group reviewed his IEPs, progress reports, and private evaluations then conducted separate assessments because the goals and objectives in his IEPs were not appropriate for him. (*Id.*) Sheerin noted that the DATA Group provides W.L. with: an average of five hours of direct BCBA supervision which includes a supervising BCBA working directly at least once a week for three hours; and speech-language therapy services twice a week for forty-five minutes. (*Id.* at 20–21.) Sheerin testified that W.L. has made significant progress in many areas at the DATA Group. (*Id.*)

On cross-examination, Sheerin testified that W.L. did not master numerous goals in the DATA Group's program during the 2020–2021 school year, and that it is appropriate to carry goals over to a subsequent year. (*Id.* at 21.) Additionally, Sheerin conceded that evaluating a student based on a single observation is "pretty dangerous" as a student might be having a bad day during the observation. (*Id.*) Sheerin confirmed that the DATA Group does not offer opportunities for interaction with non-disabled peers. (*Id.*) Sheerin acknowledged she relied upon the 2019–2020

IEP not the 2020–2021 IEP in devising the DATA Group's program for W.L. (*Id.* at 21–22.)[4]

Judge Morejon found Sheerin's testimony to be inaccurate and not credible regarding the DATA Group "being a legally compliant out of district placement, when she erroneously stated that the DATA Group had accepted two students from Roseland and Montclair, that been placed there with district-sponsored approval. This testimony was later rescinded after her testimony." (*Id.* at 33.) Further, Judge Morejon did not consider Sheerin's testimony "in determining if the District has provided [W.L.] with FAPE, as she testified that she was relying on the [2019–2020 IEP] and not the [2020–2021 IEP]." (*Id.* at 32–33.)

Plaintiffs also presented Dr. Fiorile as a witness, who was qualified as an expert in the areas of ABA and developing programs for students with autism. (*Id.* at 22.) Dr. Fiorile testified that she became involved with Plaintiffs due to their concerns regarding W.L.'s school aversion and social functioning. (*Id.*) She further testified that many of the goals in the 2019–2020 IEP were written with the expectation that W.L. would require a prompt to perform the particular skill, which is improper because the student should be expected to perform the skill independently. (*Id.*) Dr. Fiorile testified that W.L. was significantly impaired and functioning like a preschool student. (*Id.* at 23.) Dr. Fiorile noted: that the level of behavior intervention consultation provided to W.L. in the 2019–2020 IEP was inadequate; data was not being collected during her observation of W.L. at the Laning Elementary School; and her concern with the teaching strategies being implemented by W.L.'s teacher. (*Id.* at 23–24.) Dr. Fiorile testified that she did not believe W.L.'s IEP was appropriate. (*Id.* at 24–25.)

---

[4] Sheerin testified that students from the school districts of Roseland and Montclair had been placed in the DATA Group with IEPs from those school districts. (*Id.* at 22.) However, following Sheerin's testimony, the parties stipulated that there was only one student at the DATA Group who was attending the behavioral service provider with an IEP from a public school district. (*Id.* at 22 n.5.)

On cross-examination, Dr. Fiorile testified that she only observed W.L. once at the Laning Elementary School, and that she did not gather additional information from the District after her observation. (*Id.* at 25.) Dr. Fiorile conceded that she regretted not requesting the District's "program book" for W.L. because it would have assisted in her assessment of the District's data collection. (*Id.*) Dr. Fiorile acknowledged that the District was correctly educating W.L. in some respects. (*Id.* at 26.)

Judge Morejon found Dr. Fiorile's opinions were not credible because "she did not even review, much less opine on, [W.L.]'s progress reports over the remainder of the school year following her observation in December 2019, and she never requested to see his program book, which she testified was a mistake on her part." (*Id.* at 32.) Judge Morejon also found that Dr. Fiorile's opinions were flawed "because she relied on a single observation several months into the school year, which [Plaintiffs'] own witness, Sheerin, agreed was not a proper thing to do." (*Id.*) Judge Morejon found that Dr. Fiorile made erroneous assumptions during her classroom observation which "could have been rectified had Dr. Fiorile submitted questions to the District following her observation." (*Id.*) Similar to Judge Morejon's findings regarding Fog's testimony, Judge Morejon noted Dr. Fiorile did not offer an expert opinion about the adequacy of the 2020–20201 IEP, "or why the [D]istrict's incorporation of some of her recommendations would not have been sufficient." (*Id.* at 32.)

Next, Plaintiffs testified regarding the facts at issue. (*Id.* at 26.) C.L. does not work, and generally, she was the parent who communicated directly with the District, the expert witnesses that Plaintiffs retained, and the DATA Group. (*Id.*) G.L. testified that he works long hours including weekends, but noted that "C.L. and I are a team and we discuss everything together before making any decisions." (*Id.* at 26–27.) Plaintiffs testified as to why they believed the District was not

providing W.L. with FAPE and why he should attend the DATA Group. (*Id.* at 27.) C.L. testified that Plaintiffs had not decided to place W.L. at the DATA Group until after Plaintiffs conferred with Dr. Fiorile and Fog about the proposed 2020–2021 IEP from the District. (*Id.*) However, C.L. also testified that she did not discuss the 2020–2021 IEP with the District. (*Id.* at 28.) C.L. stated she wanted W.L. to succeed in public school, but Plaintiffs did not have faith in the District and the proposed 2020–2021 IEP because W.L. had regressed since his enrollment in the District. (*Id.*)

On cross-examination, C.L. acknowledged that Plaintiffs' attorney sent the District a letter in June 2020 prior to the meeting with the District's CST which, for the first time, provided Dr. Fiorile and Fog's evaluation reports to the District and communicated Plaintiffs' intention to place W.L. at the DATA Group. (*Id.*) Further, C.L. testified that she did not inform the District that W.L. attended private educational sessions multiple times a week after school during the 2019–2020 school year. (*Id.* at 29.)

Judge Morejon found Plaintiffs were credible in testifying about their desire to place W.L. in the best program for him resulting in their decision to enroll him at the DATA Group. (*Id.* at 33.) However, Judge Morejon found Plaintiffs did not provide credible testimony regarding the timing of their decision to enroll W.L. at the DATA Group because the record and testamentary evidence reflected that Plaintiffs made their decision before meeting with the District's CST in June 2020. (*Id.*) Judge Morejon also noted C.L.'s concession that Plaintiffs had decided to place W.L. at the DATA Group prior to the meeting with the District's CST. (*Id.*)

Finally, Plaintiffs presented O'Keefe as a witness, a BCBA who was qualified as an expert in ABA and educating students with autism. (*Id.* at 29.) O'Keefe began working with W.L. in July 2019, and works with him once a week by supervising the behavior technician who works with W.L. (*Id.*) Additionally, O'Keefe testified that she oversees W.L.'s "home program" and provided

training for Plaintiffs such as tutorials on how to collect data. (*Id.*) O'Keefe testified that W.L. would benefit from a full day of ABA instruction with a one-to-one behavior technician, instead of attending an ESY program. (*Id.*) O'Keefe noted that W.L. tends to become obsessed and dependent on the iPad which results in tantrums lasting more than 30 minutes. (*Id.*)

O'Keefe testified that she worked with Plaintiffs during the week that W.L. began to display school aversion behaviors, and that she would provide services before school to assist in correcting W.L.'s behavior. (*Id.* at 29–30.) O'Keefe noted there were a few days in October 2019 that it was impossible to get W.L. to go to school because he engaged in excessive crying and verbalized "no school" and "no friends." (*Id.* at 30.) O'Keefe testified that W.L. was "excellent" during the remote instruction she provided throughout the COVID-19 Pandemic. (*Id.*) Upon learning that W.L. was displaying "novel behaviors" with the District's staff during remote instruction, O'Keefe testified that she recommended W.L. discontinue remote instruction with the District. (*Id.*) Following W.L.'s enrollment at the DATA Group, O'Keefe testified she observed the following: W.L. appeared happy, more regulated, and "more available for language"; W.L. engaged in less self-stimulatory behavior; his social interactions increased; and he displayed an increase in spontaneous language and verbal communication and a decrease in maladaptive behaviors. (*Id.*)

On cross-examination, O'Keefe testified that she had minimal communication with Raskin. (*Id.* at 31.) O'Keefe conceded that W.L.'s maladaptive behavior was specific to home instruction. (*Id.*) Judge Morejon found that O'Keefe provided credible testimony regarding her ABA instructions of W.L. during the 2019–2020 school year, interactions with Plaintiffs, and communications with the District. (*Id.* at 33.)

Ultimately, Judge Morejon concluded that the District had "met its burden of demonstrating that the 2019–2020 IEP provided [W.L.] with a free appropriate public education and its proposed

IEP for the 2020–2021 school year would have provided a free appropriate public education." (*Id.* at 36.) Judge Morejon found that "the District's IEP is based on ABA principles and integrates related services, such as speech and language therapy and occupational therapy, that are appropriate for [W.L.]'s needs as an autistic student. . . . [T]he proposed 2020–21 IEP incorporated many of the recommendations put forth by [Plaintiffs'] two experts." (*Id.*) Further, Judge Morejon held, in pertinent part, that:

> The record herein discloses that [Plaintiffs] provided proofs in their attempt to demonstrate alleged failures by the District concerning its failure to address known school refusal issues; alleged failure to address assistive technology concerns; alleged difficulties during remote instruction; alleged difficulty in scheduling remote instruction; allegedly false or inadequate data collection, and the allegedly inappropriate goals and objectives in [the] 2019–2020 IEP. However, said alleged deficiencies when reviewed in real time as they occurred do not rise to the level of demonstrating that the District failed to provide [W.L.] with FAPE.
>
> There is no dispute that [Plaintiffs] initially accepted the 2019–2020 IEP, despite whatever misgivings they may have had thereafter. The record is replete with instances of [Plaintiffs] failing to share information with the District in a timely manner. These include: not providing data from [W.L.]'s summer 2019 privately-provided programming, not disclosing that [W.L.] was attending [private educational sessions] multiple times a week after school, not disclosing the significant changes at home that clearly had a likelihood of affecting [W.L.] negatively (lapse of home ABA services and departure of their nanny), not disclosing in a timely manner that they had relocated to their shore home in the spring of 2020, not providing the district with a timely explanation of why they were terminating remote instruction at the end of May, and not sharing their expert reports until several days before the June 2020 IEP meeting.
>
> For the reasons stated herein I **CONCLUDE** that the failures by the District as alleged by the [Plaintiffs], and the deficiencies noted by [Plaintiffs'] experts concerning the 2019–2020 IEP and by extension the proposed 2020–2021 IEP, did not deny [W.L.] a free appropriate public education, as the Third Circuit finds these allegations of implementation even if true, to be "such de minimus failures to implement an IEP do not constitute violations of the IDEA. <u>Melissa</u>

> S. v. Sch. Dist. Of Pittsburgh, 183 F. App'x 184, 187 (3d Cir. 2006)
> (citing Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349
> (5th Cir. 2000)[sic].

(*Id.* at 37–38 (emphasis in original).)

As to Plaintiffs' unilateral placement of W.L. at the DATA Group, Judge Morejon concluded that Plaintiffs were not entitled to reimbursement because Plaintiffs' conduct was unreasonable in the IEP process. (*Id.* at 38–39.) Judge Morejon held "[t]he record reveals that [Plaintiffs] did not collaborate with the District during [W.L.]'s 2019–2020 school year. (*Id.* at 38.) Judge Morejon found it "troublesome" that: (1) Plaintiffs produced their expert reports "just several days prior to the June 2020 IEP meeting"; (2) W.L. was unilaterally enrolled in the DATA Group in June 2020; and (3) "Dr. Fiorile's report is dated April 12, 2020, two months before it was provided to the District with a transmittal letter from [Plaintiffs'] counsel giving notice of their intention to unilaterally place [W.L.] at [t]he [DATA] Group if the [D]istrict did not agree to place him there itself." (*Id.* at 39.) Judge Morejon noted "[t]he explanations offered by [Plaintiffs] for this delay is not convincing. But even if there were valid reasons for not turning the report over promptly, there was no valid excuse for predetermining the unilateral placement without first attempting to collaborate on improvements to the [D]istrict's program." (*Id.*)

### E. Procedural History of this Action

On February 16, 2023, Plaintiffs filed the Complaint in this matter.[5] (ECF No. 1.) The Complaint asserts the November 17, 2022 Final Decision should be overturned because Judge

---

[5] This matter was originally assigned to the Honorable John Michael Vazquez, U.S.D.J. (Ret.). Plaintiffs did not submit a filing fee as required by 28 U.S.C. § 1914, or file an application to proceed *in forma pauperis*. (ECF Nos. 1.) The Clerk of Court advised Plaintiffs by letter, dated February 17, 2023, that Plaintiffs' filing was deficient. (ECF No. 2.) On April 25, 2023, Judge Vazquez entered an Order deeming the Complaint withdrawn because of Plaintiffs' failure to pay the filing fee or submit an application to proceed *in forma pauperis*. (ECF No. 6.) Thereafter, Plaintiffs' payment was processed, and the matter was reopened on April 28, 2023.

Morejon erred in finding: (1) the BOE offered W.L. a free, appropriate public education; and (2) Plaintiffs were unreasonable in unilaterally placing W.L. at the DATA Group. (ECF No. 1 ¶¶ 58–84.) The BOE filed the Answer on March 27, 2023. (ECF No. 4.) On June 9, 2023, the Honorable Andre M. Espinosa, U.S.M.J. granted the parties leave to file cross-motions for summary judgment. (ECF No. 11.) On September 14, 2023, this matter was reassigned to the undersigned. (ECF No. 12.)

On December 14, 2023, the BOE filed its Motion for Summary Judgment. (ECF No. 17.) On December 15, 2023, Plaintiffs filed their Motion for Summary Judgment. (ECF No. 18.) The parties' Joint Appendix was filed on the same date. (ECF No. 19.) Thereafter, on February 20, 2024, the parties each filed oppositions. (ECF Nos. 25, 26.) On February 26, 2024, the parties filed their respective replies. (ECF Nos. 27, 28.)

## II.   LEGAL STANDARD

### A.   Standard on Administrative Appeals

The standard of review in an administrative appeal under the IDEA differs from the standard of review governing a typical summary judgment motion. *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003). "When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Under this standard, 'factual findings from the administrative proceedings are to be considered prima facie correct,' and 'if a reviewing court fails to adhere to them, it is obliged to explain why.'" *Shore Reg'l*, 381 F.3d at 199 (quoting *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003)). "In addition, if a[n ALJ] has heard live testimony and has found the testimony of one witness to be more worthy of belief than the

contradictory testimony of another witness, that determination is due special weight." *Id.* In other words, "a District Court must accept the [ALJ]'s credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Id.* (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995), *cert. denied*, 517 U.S. 1135 (1996)). Legal determinations are reviewed *de novo*. *See P.N. v. Greco*, 282 F. Supp. 2d 221, 235 (D.N.J. 2003); *see also M.A. v. Wall Twp. Bd. of Educ.*, Civ. A. No. 20-05218, 2021 WL 5448911, at *4 (D.N.J. Nov. 22, 2021) ("[T]he district court's review over questions of law and the ALJ's application of legal precepts is plenary.")

Where there is "no new evidence presented to the district court, . . . 'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *M.A. ex rel. G.A.*, 202 F. Supp. 2d at 359. "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270. Further, "the party challenging an administrative decision faces the additional hurdle of overcoming a presumption that the Hearing Officer's findings were correct." *Andrew M. v. Delaware Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 345 (3d Cir. 2007) "Applying these standards, the district court may make findings 'based on the preponderance of the evidence[.]'" *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)).

## B.    Summary Judgment Standard[6]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A party asserting a genuine dispute of material fact must support the assertion by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). "Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019) (citations omitted). Irrelevant or unnecessary factual disputes will also not preclude a grant of summary judgment. *See Anderson*, 477 U.S. at 248. Moreover, "mere speculation does not create genuine issues of material fact." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215–16 (3d Cir. 2011)

---

[6] *See M.G. ex rel. M.G. v. N. Hunterdon-Voorhees Reg'l High Sch. Dist. Bd. of Educ.*, Civ. A. No. 17-12018, 2018 WL 4761581, at *3 (D.N.J. Oct. 2, 2018) (noting that, in the context of an appeal of an administrative decision under the IDEA, the principles of summary judgment apply where the "matter is before the Court on motions for summary judgment").

(citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a movant adequately supports its summary judgment motion, the burden shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). In other words, in deciding a party's summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 255. "Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the nonmovant." *Adams v. Fayette Home Care & Hospice*, 452 F. App'x 137, 139 (3d Cir. 2011) (citing *Anderson,* 477 U.S. at 248, 255).

If the moving party bears the burden of proof at trial, summary judgment is not appropriate if the evidence is susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the non-moving party bears the burden of proof at trial, "summary judgment is warranted if the nonmovant fails to 'make a showing

sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 322). A "genuine issue as to any material fact" cannot exist if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

## III.   DECISION

The BOE moves for summary judgment, arguing Judge Morejon's November 17, 2022 Final Decision should be affirmed because the record supports his decision. (ECF No. 17-2 at 2–40.) The BOE asserts: (1) Judge Morejon correctly ruled that "clandestine recordings" were inadmissible; (2) Judge Morejon's factual findings were primarily based on his proper assessment of the witnesses' credibility and reliability; (3) the District's proposed IEP met the required standard; (4) the DATA Group is not a reimbursable placement; and (5) Plaintiffs acted unreasonably. (*Id.* at 6–40.)

Plaintiffs also move for summary judgment, arguing Judge Morejon's November 17, 2022 Final Decision must be reversed because there are clear errors of law. (ECF No. 18-1 at 6.) Plaintiffs argue: (1) Judge Morejon erred in finding that the District met its burden of proof for establishing that it offered a FAPE to W.L.; (2) Judge Morejon's decision was against the weight of evidence and inconsistent with state and federal special education laws; (3) Judge Morejon erred in finding that W.L.'s program was differentiated to meet his individual needs; (4) Judge Morejon

failed to consider substantial testimony related to the appropriateness of W.L.'s program; (5) Judge

Morejon erred by considering programs that the District could have offered to WL but did not; (6)

Judge Morejon should not have considered testimony regarding the impact of the COVID-19

pandemic; (7) Judge Morejon did not address the District's evident failure to assess W.L. in all

areas of suspected disability; (8) Judge Morejon should not have excluded relevant evidence from

"consensual recordings"; and (9) Plaintiffs' unilateral placement of W.L. at the DATA Group was

appropriate and reasonable requiring the District to be responsible for the costs of W.L.'s

placement. (*Id.* at 7–40.)

As detailed below, the Court finds remand is necessary in this matter. Therefore, the Court

will not address each of the parties' arguments; instead, the Court will address the arguments which

are relevant to the Court's order to remand.

### A.     Judge Morejon Improperly Barred the Audio Recordings

Plaintiffs argue Judge Morejon improperly excluded "consensual" audio recordings. (ECF

No. 18-1 at 25–35.) Plaintiffs assert reviewing courts are permitted to consider additional evidence

at the request of a party under the IDEA.[7] (*Id.* at 26.) Plaintiffs state they "installed a recording

---

[7] The IDEA permits a federal district court to consider additional evidence in its review of the underlying administrative proceeding. *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 500 (D.N.J. 1997); 20 U.S.C. § 1415(i)(2)(C)(ii) (providing that a district court "shall hear additional evidence at the request of a party"). A district court "must consider the party's request to admit additional evidence, may not summarily reject the request, and may use and weigh evidence in its sound discretion." *D.K. v. Abington Sch. Dist.*, Civ. A. No. 08-4914, 2010 WL 1223596, at *4 (E.D. Pa. Mar. 25, 2010), *aff'd*, 696 F.3d 233 (3d Cir. 2012) (citation omitted); *see also Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995) ("[T]he question of what additional evidence to admit in an IDEA judicial review proceeding . . . should be left to the discretion of the trial court." (citations omitted)). Courts have interpreted the IDEA's additional evidence clause as meaning "supplemental," and noted "[t]he reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *Town of Burlington v. Dep't of Educ. for Mass.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1984); *N. Highlands Reg'l High*

device in their child's belongings on October 24, 2019, December 20, 2019[,] and January 3, 2020. The resulting recordings were highly relevant both to the FAPE inquiry and to the credibility of the District's witnesses as to the success of [W.L.]'s program."[8] (*Id.* at 27.) Plaintiffs assert "the application of the Wiretap [Act] in a public setting where there is little expectation of privacy is misplaced. It has long been recognized that public school classrooms do not provide teachers with an expectation of privacy in most cases." (*Id.* at 30.) Plaintiffs argue they were entitled to provide vicarious consent on behalf of W.L. for the subject recordings. (*Id.* at 31–32.) Further, Plaintiffs assert Judge Morejon improperly relied upon the BOE's District Policy 5516 in finding that the audio recordings were inadmissible. (*Id.* at 33; ECF No. 28 at 12.)

---

*Sch. Bd. of Educ. v. C.E. ex rel. C.E.*, Civ. A. No. 18-cv-08999, 2019 WL 5975548, at *5 (D.N.J. Nov. 12, 2019).

[8] The Court has not been provided with the audio recordings at issue, but Plaintiffs summarized the contents of two of the recordings. (ECF No. 18-1 at 28–29.) The Court is disquieted by the alleged contents of the audio recordings. *See* ECF No. 18-1 at 28 ("[The recording on October 24, 2019] disclosed that the two aides and a teacher largely ignored [W.L.]. His efforts to communicate are not reciprocated; there is no effective follow-through when aides are giving him directions; while he is eating an apple, an aide says he is disgusting. His activities in the bathroom, unaccompanied and unsupervised, are complained about by both aides. Aides engage in frequent chatter with each other and also complain about Plaintiffs. After hours in this classroom, [W.L.] can be heard screaming and engaging in stimming behavior. [W.L.] missed hours of opportunities to make meaningful progress in his District program, which purported to be an ABA program."); *id.* at 28–29 ("On December 20, 2019, Plaintiffs again sent their son to school with a recording device. The recording disclosed a lack of engagement with [W.L.] by his aide throughout the day, that aides instead spent time ridiculing Plaintiffs' effort to send in a holiday gift for both [W.L.] and his only classmate, even including [W.L.] in on the joke by asking [W.L.] 'who got you this present' knowing he would not understand the meaning of the joke. They ridiculed a bag that has a picture of [W.L.] on it that was sent in with him that day, opining that it must be for presents [W.L.] would be receiving. Aides are heard to say that this was an example of [W.L.], then age 5, being 'spoiled' and 'entitled.'"). The authenticity of the recordings has not been verified as Judge Morejon did not conduct a *Driver* hearing, and the BOE was unable to complete its forensic inspection prior to Judge Morejon's August 18, 2021 Order. (ECF No. 19-17; ECF No. 25 at 27; ECF No. 28 at 14.) Therefore, the Court merely notes the alleged contents.

In opposition, the BOE argues Judge Morejon properly excluded the audio recordings and the August 18, 2021 Order should be affirmed because the recordings violated the Wiretap Act and the BOE's District Policy 5516. (ECF No. 25 at 17–27.) The BOE asserts Plaintiffs' vicarious consent argument is misplaced. (*Id.* at 22–25.) The BOE contends even if Judge Morejon should have permitted the introduction of the audio recordings, his decision "is harmless error at most, as there is no reason to believe they possibly could have affected the outcome of this case. According to [P]laintiffs' themselves, the recordings were made on only several days . . . ." (*Id.* at 26–27.)

In reply, Plaintiffs assert the BOE "ignores the multiple references cited in Plaintiffs' Brief to the current climate of student recording in schools and diminished expectation of privacy, particularly in one-party consent states, as recognized by even the New Jersey Principals Association." (ECF No. 28 at 13.)

The parties submitted briefing on this issue to Judge Morejon, and he issued an Order dated August 18, 2021 which granted the BOE's motion to suppress the audio recordings. ALJs "may, in his [or her] discretion, exclude any evidence if he [or she] finds that its probative value is substantially outweighed by the risk that its admission will either necessitate undue consumption of time or create substantial danger of undue prejudice or confusion." N.J. Stat. Ann. § 52:14B-10; *see also* N.J. Admin. Code § 1:1-15.1(c). Judge Morejon ultimately held that the audio recordings were inadmissible because they violated the Wiretap Act and the BOE's District Policy 5516. (ECF No. 19-17 at 6–10.) As noted above, the Court employs a *de novo* or plenary standard in its review of Judge Morejon's legal determinations. *P.N.*, 282 F. Supp. 2d at 235; *see also M.A. v. Wall Twp. Bd. of Educ.*, 2021 WL 5448911, at *4.

Under the Wiretap Act,[9] an "aggrieved person . . . may move to suppress the contents of an

---

[9] The Wiretap Act has a federal analogue codified at 18 U.S.C. § 2511, *et seq.*

intercepted wire, electronic or oral communication . . . on the grounds that . . . the communication was unlawfully intercepted." N.J. Stat. Ann. § 2A:156A-4(d); *see also State v. Gumbs*, Docket No. A-2751-16T3, 2018 WL 2341191, at *5 (N.J. Super. Ct. App. Div. May 24, 2018) ("The remedy for an illegal interception is the suppression of evidence.") (citing *State v. Worthy*, 661 A.2d 1244, 1253–54 (N.J. 1995)). The Wiretap Act contains a "consent exception" provision which provides that it is lawful for:

> A person not acting under color of law to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception unless such communication is intercepted or used for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of this State or for the purpose of committing any other injurious act.

N.J. Stat. Ann. § 2A:156A-4; *see also* 18 U.S.C. § 2511(2)(d).

This provision "has been interpreted to incorporate 'vicarious consent' as well." *D'Onofrio v. D'Onofrio*, 780 A.2d 593, 597 (N.J. Super. Ct. App. Div. 2001) (citations omitted). Indeed, "[b]ecause children lack the legal capacity to consent, courts have held that a parent or guardian may authorize the recording of his or her minor child's conversation." *Id.* (citations omitted). However, vicarious consent is not "a sweeping exemption, and blanket allegations of 'best interests' simply will not suffice to render vicarious consent permissible under [the] Wiretap Act." *Id.* at 598. Conversely, "what is required is a good faith basis that it is objectively reasonable for believing that consent on behalf of the minor to taping is necessary and in the best interest of the child." *Id.*; *see also Pollock v. Pollock*, 154 F.3d 601, 610 (6th Cir. 1998) (holding the consent exception contained in 18 U.S.C. § 2511(2)(d) "should not be interpreted as permitting parents to tape any conversation involving their child simply by invoking the magic words: "I was doing it in his/her best interest," there are situations, such as verbal, emotional, or sexual abuse by the other

32

parent, that make such a doctrine necessary to protect the child from harm. It is clear that this is especially true in the case of children who are very young. It would be problematic, however, for the Court to attempt to limit the application of the doctrine to children of a certain age, as not all children develop emotionally and intellectually on the same timetable, and we decline to do so.")

In applying the *de novo* standard of review, the Court disagrees with Judge Morejon and finds that Plaintiffs' recordings are admissible pursuant to the "consent exception." Judge Morejon's analysis in the August 18, 2021 Order provided the following:

> The differences between [*D'Onofrio*] and the current case are stark. In [*D'Onofrio*], the party introducing the recording was able to point to evidence such as past testimony or a history of violating court orders to demonstrate the child was in danger. [*See D'Onofrio*, 780 A.2d at 598]. In [*D'Onofrio*], the [w]iretap occurred at the parties' homes where the conversation was known, and the parent had a duty to protect their child. [*See D'Onofrio*, 780 A.2d at 597]. In the within case [Plaintiffs] placed an audio recording device on [W.L.] before sending him to school to record various conversations. In doing so, [Plaintiffs] have failed to demonstrate a history or events concerning [W.L.]'s caretakers that would lead [Plaintiffs] to believe [W.L.]'s safety is at risk. Although [Plaintiffs] allege there was fear for [W.L.], they have not provided examples of circumstances that this belief is objectively reasonable. Simply put, [Plaintiffs] have not identified a person or event that led them to suspect abuse or neglect.
>
> While [W.L.]'s disability is acknowledged as limiting [Plaintiffs] from understand[ing] what [may be] upsetting [W.L.], [Plaintiffs] do not point to previous circumstances that would demonstrate their belief is objectively reasonable. Instead, [Plaintiffs] submit the audio recording under the assertion they were concerned for [W.L.]'s safety, the kind of blanket statement the [New Jersey] Superior Court explicitly warned against in [*D'Onofrio*, 780 A.2d at 598]. I **CONCLUDE** that the doctrine of vicarious consent is an extremely limited exception not applicable to the current case.

(ECF No. 19-17 at 7–8 (emphasis in original).) The Court finds Judge Morejon's distinguishment between *D'Onofrio* and this matter is misplaced. Following the logic in the August 18, 2021 Order, it appears that the limited nature of W.L.'s ability to communicate effectively prevents Plaintiffs

from providing vicarious consent. The Third Circuit has not directly addressed this issue. In *Pollock*, a case approvingly cited to by the *D'Onofrio* court, the Sixth Circuit declined to adopt a bright-line rule, but provided this Court with guidance by noting "not all children develop emotionally and intellectually on the same timetable." 154 F.3d at 610. Given W.L.'s disabilities and difficulties in communicating, the Court finds the testamentary evidence before the Court establishes that Plaintiffs had an objectively reasonable basis to believe that consent on behalf of W.L. to tape his LSS program was necessary and in his best interests. There is ample testimony in the record which establishes that W.L. began to display unusual school aversion behaviors involving tantrums and excessive crying in Fall 2019. During the time that W.L. displayed school aversion behavior, G.L. testified that:

> W.[L.] was very [dysregulated.] He was very distraught. He was verbalizing, which, at the time was very unusual for W.[L] He did not have many words, and he didn't have access to many words. But he was saying "No, Mommy. No school. No friends." And he would throw himself to the ground. He would get that stiff body that's almost impossible to mobilize, and it would -- it would require restraining him to really get him to move, and we felt that was too traumatic.

(ECF No. 19-23 (Tr. of Sept. 22, 2021 Proceeding) 136:9–17.)[10] Based on the foregoing, the Court finds Plaintiffs' recordings are admissible under the "consent exception."

Additionally, the Court finds Judge Morejon erred in concluding that the recordings are inadmissible due to an alleged violation of the BOE's District Policy 5516. The subject policy states: "students and/or school staff members should not be subject to having a video or audio recording taken of any student(s) or school staff member(s) for any purpose without the consent of the student, the student's parent, and/or the school staff member." (ECF No. 19-17 at 8; ECF

---

[10] G.L. provided this testimony after Judge Morejon's August 18, 2021 Order.

No. 25 at 21.) The BOE's District Policy 5516 notes purposes including protection of: privacy rights, the integrity of the District's educational program, and the District's learning environments. (*See id.*) Ultimately, the policy provides that "[a]n [electronic communication and recording device] used in violation of this Policy will be confiscated by a school staff member . . . and the student will be subject to appropriate disciplinary action." (ECF No. 25 at 22.) Here, the Court is not persuaded by Judge Morejon's reliance upon N.J.S.A. § 18A:11-1(c)[11] and *Pollack v. Reg'l Sch. Unit 75*, Civ. A. No. 13-cv-109, 2017 WL 1592264 (D. Me. Apr. 28, 2017).[12] Indeed, Judge Morejon provides a partially inaccurate summary of the holdings in *Pollack*. (*See* ECF No. 19-17 at 9–10.) The Court finds the BOE's District Policy 5516 does not affect the admissibility of the

---

[11] "Title 18A of the New Jersey Statues, the Education Code, includes several provisions addressing the scope of the legislative grant of authority to boards of education." *Rozenbilt v. Lyles*, 243 A.3d 1249, 1259 (N.J. 2021). N.J.S.A. § 18A:11-1(c) merely authorizes boards of educations to "[m]ake, amend and repeal rules, not inconsistent with [Title 18A] or with the rules of the state board, for its own government and the transaction of its business and for the government and management of the public schools and public school property of the district . . . ." N.J. Stat. Ann. § 18A:11-1(c). Based upon the Court's research, it appears there are no cases which have ruled that a recording is inadmissible in a judicial proceeding pursuant to a board of education's policy created under N.J.S.A. § 18A:11-1(c).

[12] In *Pollack*, the parents of a student diagnosed with autism and a language disorder requested multiple times that the student be equipped with a recording device or body camera during the entire school day so that the parents could understand what happened during the school day. 2017 WL 1592264, at *1–3. In reliance upon its policy restricting employee and student use of cellphones during the school day, the school district rejected the parents' requests. *Id.* at *3. After a three-day special education due process hearing, a Maine Department of Education Hearing Officer held that the school district's rejections of the parents' requests did not deprive the student of FAPE. *Id.* at *5. The District of Maine addressed Plaintiffs' claims under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the First Amendment. *Id.* at 5–18. The District of Maine held that Plaintiffs' reliance on a regulation it referred to as the Effective Communication Regulation, 28 C.F.R. § 35.160 was not persuasive, and ultimately granted the school district's motion for summary judgment as to the plaintiffs' claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act because the claims were foreclosed by the administrative decision under principles of *res judicata*. *Id.* at *7–11. The district court denied the parties' respective motions for summary judgment on plaintiffs' First Amendment claim. *Id.* at 11–18.

recordings. As Plaintiffs correctly note, "the remedy for violating a school policy is disciplining the student if appropriate. It is not exclusion of relevant evidence in a court proceeding to address the educational needs of a disabled child the District's obligations under the IDEA."[13] (ECF No. 18-1 at 33–34.) Accordingly, the Court finds reversal of Judge Morejon's August 18, 2021 Order is warranted.

Although Plaintiffs assert that they only attached the recording device to W.L. on three days, the contents of the recordings may provide valuable insight on the relevant IEPs and the credibility of the witnesses. Specifically, the potential admissibility of the recordings may impact the analysis of whether the BOE provided FAPE in the LRE to W.L. in the 2019–2020 IEP and the proposed 2020–2021 IEP. Therefore, instead of exercising its discretion and allowing Plaintiffs to provide additional evidence by supplementing the record before this Court, the Court finds it proper to remand this matter to Judge Morejon. *See Rowley*, 458 U.S. at 206 ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought."); *see also id.* at 208 (cautioning that "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'") (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42

---

[13] The Court is somewhat persuaded by Plaintiffs' reliance on *Plock v. Bd. of Educ. of Freeport Sch. Dist.*, 545 F. Supp. 2d 755, 758 (N.D. Ill. 2007), which provides that "[a]ny expectations of privacy concerning communications taking place in special education classrooms such as those subject to the proposed audio monitoring in this case are inherently unreasonable and beyond the protection of the Fourth Amendment." However, the Court notes the facts in *Plock* significantly differ from the facts at issue here.

(1973)); *accord R.R. v. Maheim Twp. Sch. Dist.*, 412 F. App'x 544, 549 (3d Cir. 2011).

The next step in the analysis of whether the audio recordings are admissible will involve a determination of whether the subject recordings are authentic and unaltered. As noted by Judge Morejon in the August 18, 2021 Order, New Jersey courts apply a five-part test for the admissibility of recordings:

> the speakers should be identified and it should be shown that (1) the device was capable of taking the conversation or statement, (2) its operator was competent, (3) the recording is authentic and correct, (4) no changes, additions or deletions have been made, and (5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement.

*State v. Driver*, 183 A.2d 655, 672 (N.J. 1962). More recently, the Supreme Court of New Jersey has held that "[i]n light of technological advances in the forty years since *Driver*, which have made recording devices more compact, reliable, and easy to use, the second *Driver* factor—the operator's competence—no longer requires separate consideration." *State v. Nantambu*, 113 A.3d 1186, 1195–96 (N.J. 2015). Accordingly, if Judge Morejon deems it necessary, the *Driver* test will decide the admissibility of the audio recordings.

### B.    Judge Morejon Properly Excluded Dr. Fiorile and Fog's Testimony

Plaintiffs contend Judge Morejon improperly barred Dr. Fiorile and Fog from providing expert testimony on certain subjects. (ECF No. 18-1 at 15–20; *see also* ECF No. 26 at 37–40; ECF No. 28 at 4–11.) Plaintiffs submit expert witnesses are not limited to testifying to the "four corners" of their expert reports. (ECF No. 18-1 at 16; ECF No. 26 at 37.) In reliance upon the "five-day rule,"[14] the BOE argues Judge Morejon properly precluded Dr. Fiorile and Fog from opining on

---

[14] New Jersey's "five-day rule" is codified at N.J.A.C. § 1:6A-10.1, which provides, in part, that "[e]ach shall disclose to the other party any documentary evidence and summaries of testimony intended to be introduced at the hearing" within five days prior to the hearing. N.J. Admin. Code. § 1:6A-10.1.

the adequacy of the 2020–2021 IEP. (ECF No. 25 at 8–11; *see also* ECF No. 27 at 10–11.)

Here, Judge Morejon sustained the BOE's objection and barred Fog from opining on the adequacy of the 2020–21 IEP because Fog did not opine on the 2020–2021 IEP in her expert report and Plaintiffs did not provide prior notice of the scope of Fog's testimony. (ECF No. 19-19 (Tr. of June 29, 2021 Proceeding) 180:12–181:6.) Based on similar reasoning, Judge Morejon barred Dr. Fiorile from opining on the adequacy of the 2020–2021 IEP and the significance of W.L.'s behavioral data compiled by the District. (ECF No. 19-21 (Tr. of July 21, 2021 Proceeding) 57:16–58:11; 130:8–17.) Based on the five-day rule and the relevant case law,[15] the Court finds that reversal of Judge Morejon's decisions to exclude portions of Dr. Fiorile and Fog's testimony is not warranted because Plaintiffs did not properly disclose the scope of Dr. Fiorile and Fog's testimony.[16]

**C.      Judge Morejon Did Not Sufficiently Analyze Whether the BOE Provided FAPE to W.L. in the LRE**

Judge Morejon found that the BOE provided FAPE to W.L., but Judge Morejon did not conduct a separate LRE analysis, or indeed, any LRE analysis. *See A.G. ex rel. S.G. v. Wissahickon Sch. Dist.*, 374 F. App'x 330, 334 (3d Cir. 2010) ("FAPE and LRE are distinguishable[.]"); *D.E.R.*

---

[15] "The most obvious purpose of the five-day rule under New Jersey and federal law is to prevent litigants from having to defend against undisclosed evidence produced at the last minute in administrative proceedings." *P.F. ex rel. G.F. v. Ocean Twp. Bd. of Educ.*, Civ. A. No. 21-19315, 2022 WL 4354791, at *11 (D.N.J. Sept. 20, 2022) (citing *Schoenbach v. District of Columbia*, Civ. A. No. 05–1591, 2006 WL 1663426, at *6 (D.D.C. June 12, 2006). "In light of the five-day rule's 'plain language,' courts faced with challenges to decisions by ALJs excluding evidence under the rule have consistently upheld the ALJ determinations." *L.J. v. Audubon Bd. of Educ.*, Civ. A. No. 06-5350, 2008 WL 4276908, at *5 (D.N.J. Sept. 10, 2008) (citations omitted).

[16] In their opposition to the BOE's Motion, Plaintiffs now cite to their witness notices for Dr. Fiorile and Fog contained in the Petition for Due Process filed on August 28, 2020. (ECF No. 26 at 38.) The Court is not persuaded by Plaintiffs' reliance on the witness notices as they are vague and did not provide the BOE with sufficient notice of Plaintiffs' intention to elicit the testimony at issue from Dr. Fiorile and Fog.

*v. Bd. of Educ. of Borough of Ramsey*, No. 04-2274, 2005 WL 1177944, at *6 (D.N.J. May 18, 2005) ("Inquiry into the LRE cannot be dismissed as immaterial because the LRE requirement is critical under the IDEA."). The record is replete with testimony regarding the District's decision to place W.L. in the LSS program which included a reverse inclusion program described as "push-in" and "pull-out" by Dr. Mauriello, but Judge Morejon did not make any conclusions as to whether W.L.'s FAPE was provided in the LRE. Therefore, the Court also instructs Judge Morejon to properly analyze whether the BOE provided W.L. with FAPE in the LRE. *See E.P. v. N. Arlington Bd. of Educ.*, Civ. A. No. 17-08195, 2019 WL 1495692, at *9 (D.N.J. Apr. 1, 2019) ("In other words, the ALJ did not consider whether [the board of education] made efforts to include [plaintiff] in an integrated classroom with supplementary aids and services for the [relevant] school year as is required by the IDEA. . . . Thus, the Court remands to the ALJ for consideration of this issue.").

## IV.   CONCLUSION

For the reasons set forth above, the BOE's Motion for Summary Judgment (ECF No. 17) is **DENIED**, Plaintiffs' Motion for Summary Judgment (ECF No. 18) is **DENIED**, and the matter is **REMANDED** to Judge Morejon for further proceedings consistent with this Opinion. An appropriate Order follows.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  July 26, 2024